## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| _____ ) | |
| ) | |
| **KELLY FAVILLE,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 22-cv-11911-DJC** |
| ) | |
| **MARK MUNRO,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |
| _____ ) | |

## MEMORANDUM AND ORDER

**CASPER, J.**                                        **December 1, 2022**

### I.     Introduction

Plaintiff Kelly Faville ("Faville") has filed this lawsuit against Defendant Mark Munro ("Munro") alleging state law claims for breach of fiduciary duty (Count I), alter ego/piercing the corporate veil (Count II), breach of contract (Count III), breach of implied contract (Count IV), breach of the implied covenant of good faith and fair dealing (Count V), detrimental reliance/promissory estoppel (Count VI), and unjust enrichment (Count VII).[1]  D. 1-3.  Faville now moves for preliminary injunctive relief.  D. 5.  For the reasons stated below, the Court DENIES the motion for a preliminary injunction.  Id.

### II.     Standard of Review

Upon a motion for a preliminary injunction, the Court must consider:  "(i) the movant's likelihood of success on the merits of its claims; (ii) whether and to what extent the movant will

---

[1] In the complaint, Faville includes a claim for an emergency preliminary injunction (Count VIII), but that is not a cause of action.  D. 1-3 ¶¶ 169–79.

suffer irreparable harm if the injunction is withheld; (iii) the balance of hardships as between the parties; and (iv) the effect, if any, that an injunction (or the withholding of one) may have on the public interest." Corp. Techs., Inc. v. Harnett, 731 F.3d 6, 9 (1st Cir. 2013) (citation omitted).

### III.    Factual and Procedural Background

The Court draws the following facts from the complaint, D. 1-3, accompanying exhibits, D. 1-4, and Munro's sworn affidavit filed in support of his opposition to the motion for preliminary injunction, D. 12-1.

Faville and Munro have known each other for over three decades.  D. 1-3 ¶ 6; D. 12-1 ¶ 3. Munro worked with Faville's late husband, Jonathan Faville ("Jonathan"), and her sister, Susan Munro ("Susan").  D. 1-3 ¶ 7.  In 1990, Munro and Susan married, and Faville met Jonathan through them.  Id. ¶ 8.

On March 10, 2018, Jonathan suddenly passed away.  Id. ¶ 10.  In the wake of his passing, Faville, who was inexperienced in financial matters, expressed worry to Munro and Susan about her financial situation.  Id. ¶¶ 12–13.  Munro assured Faville that he would look after her and counsel her on what to do with her money, including the life insurance proceeds that she received. Id. ¶ 14.

According to Faville, on or about May 22, 2018, Munro called her to propose a deal that he claimed he had been working on for himself for years.  Id. ¶ 18.  Munro told Faville that his contact, Guy DelGrande ("DelGrande"), then-owner of Tekmark Global Solutions ("Tekmark"), a global technology services firm, was seeking investment funding.  Id. ¶ 19.  Munro also told Faville that he should "do a deal with" DelGrande and Faville should "do a deal with" Munro, because DelGrande did not know Faville the way he knew Munro.  Id. ¶ 20.  She did not understand what the deal involved and simply trusted Munro to act in her best interest.  Id. ¶ 21.

Munro explained that the deal would be a loan by Faville to Munro (the "Munro Loan") and set forth the following essential terms of the Munro Loan: (1) Faville would loan Munro $1,015,000.00 (the "Munro Loan Principal"); (2) the term of the Munro Loan would be three years, at the end of which she would be repaid the full amount; (3) she would be entitled to 18% simple interest per year, with such interest to be paid in quarterly installments of $30,000, with the remaining accrued interest due at maturity; and (4) she would be entitled to the value of a 2.5% equity interest in Tekmark, which would be paid at the time of sale of the company or a change of control of 50% or more.  Id. ¶ 22.  Munro counseled Faville that this deal would be a good investment and the return on her investment would enable her to stay in her home and not worry about her finances.  Id. ¶ 23.

The terms of the Munro Loan were entirely determined by Munro, and he set the amount of the loan.  Id. ¶¶ 25–26.  On May 24, 2018, Faville transferred the Munro Loan Principal by wire to an account in the name of "1112 Third Ave Corp" ("1112 Third Ave"), per Munro's instructions. Id. ¶ 31.  Despite the fact that Munro never mentioned 1112 Third Ave in his conversation with Faville, she, nevertheless, made the transfer because Faville knew from prior conversations that Munro and Susan owned and controlled 1112 Third Ave and she trusted Munro to pay back the Munro Loan Principal and act in her best interest.  Id. ¶¶ 32–33.  Following the transfer, Faville began receiving $30,000 quarterly interest payments, as required by the Munro Loan, from an account in the name of 1112 Third Ave.  Id. ¶¶ 37, 78.  Munro disputes the foregoing description of events and instead states that Faville knowingly made the Munro Loan to 1112 Third Ave, "not to [Munro] personally . . . [and] with the hope that she would receive an usually high return on her investment."  D. 12-1 ¶¶ 5–6.

On or about August 22, 2018, Munro called Faville again to propose another "deal."  D. 1-3 ¶ 38.  At the time, Faville understood that Munro owned and/or operated a company called SCWorx LLC ("SCWorx").  Id. ¶ 39.  This new deal involved Faville making another loan, this time to SCWorx (the "SCWorx Loan").  Id. ¶ 40.  Munro set the essential terms of SCWorx Loan as follows: (1) Faville would loan SCWorx $270,000 (the "SCWorx Loan Principal"); (2) she would receive full repayment in three months, along with an additional $30,000; and (3) if the SCWorx Loan Principal and additional $30,000 were not paid in three months, she would be entitled to interest accruing at $15,000 per month.  Id. ¶ 41.  As with the Munro Loan, the terms of the SCWorx Loan were entirely determined by Munro.  Id. ¶ 43.  On August 27, 2018, Faville transferred the money by wire to Munro's personal account at JP Morgan Chase, per Munro's instructions.  Id. ¶ 48.  Munro again disputes the foregoing description of events and states that Faville knowingly made the SCWorx Loan to SCWorx, "not [to] [him] personally."  D. 12-1 ¶ 9.

On June 12, 2019, Munro emailed Faville an executed agreement entitled "2018 Line of Credit Agreement," memorializing the SCWorx Loan backdated to July 30, 2018 (the "SCWorx Note").  D. 1-3 ¶ 54.  On June 19, 2019, Munro emailed Faville an executed promissory note backdated to May 30, 2018, memorializing the Munro Loan (the "Munro Note").  Id. ¶ 60.  Following Faville's receipt of both notes, she continued to consult Munro on her personal financial decisions and her own public relations firm.  Id. ¶¶ 62, 66–67.

Originally, the Munro Loan quarterly interest payments of $30,000 were made by wire from an account in the name of 1112 Third Ave.  Id. ¶ 78.  According to Munro, however, in January 2020, Whacky Ventures LLC ("Whacky Ventures"), another company owned by him and Susan, assumed the assets and liabilities of 1112 Third Ave.  D. 12-1 ¶ 7.  Accordingly, Faville

began receiving interest payments on the Munro Loan from July 2, 2020 through October 4, 2022 from an account in the name of Whacky Ventures.  Id. ¶ 8.

In March 2021, Munro called Faville to extend the maturity date of the Munro Loan by one year to May 30, 2022, under the same terms.  D.1-3 ¶ 70.  Faville agreed and she continued to receive the required $30,000 quarterly interest payments.  Id. ¶ 71.  A few months later on July 29, 2021, Munro again called Faville to confirm the extension and reassure Faville that she would be paid by May 30, 2022.  Id. ¶ 72.

In early June 2021, Munro and Susan separated, so Faville texted Munro a few days later that she would like to be repaid on the Munro and SCWorx Loans.  Id. ¶¶ 87–88.  Throughout the ensuing year, Munro repeatedly told Faville that he would repay the loans.  Id. ¶¶ 89–97.  To date, Faville has not been repaid the Munro Loan Principal, which was due by May 30, 2022, the accrued interest, or the value of a 2.5% equity interest in Tekmark.  Id. ¶ 99.  By March 2022, Faville was paid the SCWorx Loan Principal and the required additional $30,000.00 from an account and cashier's check in the name of Whacky Ventures.  Id. ¶ 82.  While Faville contends that additional payments are still required on the Loans, D. 1-3 ¶¶ 83, 100, which Munro disputes at least as to the SCWorx Loan, D. 12-1 ¶ 9.

Munro and Susan are under contract to sell a New Jersey home[2] with the closing expected on or about December 3, 2022.  D.1-3 ¶ 172; D. 12-1 ¶ 4.  After paying off mortgages and closing costs, the net profits will exceed $2,500,000,[3] which will be divided evenly between Munro and Susan, as alleged in the complaint, and as attested to by Munro.  D. 1-3 ¶ 173; D. 6 at 19 n.12; D.

---

[2] The sale price as alleged by Faville is somewhere between $7,000,000.00, D. 1-3 ¶ 173, and close to $8,000,000.00, as Faville's counsel stated at the motion hearing.

[3] By how much the net profits will exceed this figure is not clear on the record.

12-1 ¶ 4.  Munro contests that he has sufficient assets to satisfy the amounts sought in the complaint, that he has no plans to dissipate or hide his assets, and that Whacky Ventures also has sufficient assets to satisfy any judgments relating to the notes.  D. 12-1 ¶¶ 2, 7, 10.

## IV.   Procedural History

Faville commenced this action on November 4, 2022 in Middlesex Superior Court.  D. 7 ¶ 1.  Along with her complaint, Faville filed a motion for preliminary injunctive relief.  Id. ¶ 2.  The court scheduled an emergency hearing on the motion for November 14, 2022, but Munro removed the action to this Court on November 11, 2022.  Id. ¶¶ 3, 5; D. 1.  Faville moved for preliminary injunctive relief in this Court.  D. 5.  The Court heard the parties on the pending motions and took the matters under advisement.  D. 15.

## V.   Discussion

Faville seeks preliminary injunctive relief.  Specifically, she requests that the Court (1) enjoin Munro from receiving any of the net sale proceeds of the sale of his New Jersey home; (2) require Munro to deposit $2,000,000.00 of the net sale proceeds into an escrow checking account; (3) enjoin Munro from conveying, transferring, hypothecating, encumbering, dissipating, or otherwise disposing of the proceeds in the escrow checking account; and (4) require Munro to provide Faville's counsel with the identifying information of the escrow checking account.  D. 5 at 1.

### A.   Authority to Issue Preliminary Injunction

As a threshold matter, Munro contends that this Court has no authority to issue a pre-judgment asset freeze under Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc. ("Grupo Mexicano"), 527 U.S. 308 (1999).  D. 12 at 6–7.  There, "a closely divided Supreme Court held that a preliminary injunction freezing a defendant's assets was beyond the conventional equity

power of the federal courts when the movants were merely alleged general creditors who lacked a judgment lien on or equitable interest in those assets." Iantosca v. Step Plan Servs., 604 F.3d 24, 33 (1st Cir. 2010) (citing Grupo Mexicano, 527 U.S. at 319–20, 333).  By contrast, courts "have interpreted Grupo Mexicano narrowly so as to apply its holding only to actions asserting *solely* legal causes of action or actions involving assets in which *no lien* or other equitable interest in the assets is claimed." Matrix Partners VIII, LLP v. Nat. Res. Recovery, Inc., No. 1:08-CV-547, 2009 WL 175132, at *4 (E.D. Tex. Jan. 23, 2009) (emphasis in original).  While the First Circuit has yet to so explicitly hold, it has strongly suggested that Grupo Mexicano's holding does not apply to cases involving both claims in law and equity. Iantosca, 604 F.3d at 34 (highlighting that "[i]f it were necessary to rule on the point, we would likely agree with decisions concluding that a court may, consistent with Grupo Mexicano, issue[] asset freezing injunctions in 'mixed' cases . . . where both equitable and legal remedies are sought" (alteration in original) (citing Nilson v. JPMorgan Chase Bank, N.A., 690 F. Supp. 2d 1231, 1262 (D. Utah 2009)) (internal quotation marks omitted)).

The Fourth Circuit's decision in United States ex rel. Rahman v. Oncology Assocs. ("Rahman"), 198 F.3d 489 (4th Cir.1999), is particularly instructive on this position. See Newby v. Enron Corp., 188 F. Supp. 2d 684, 695 (S.D. Tex. 2002).  In that case, the Fourth Circuit considered whether the district court had the authority to enter "a pre-judgment, asset-freezing injunction on the United States' allegations that the defendant oncology service providers defrauded the Medicare and CHAMPUS programs and thereafter were engaging in complex reorganizations and transfers of assets to insulate themselves from liability." Rahman, 198 F.3d at 492 (footnote omitted).  The Rahman court concluded that "Grupo Mexicano's holding is carefully circumscribed, providing specifically that the general equitable powers of the federal

courts do not include the authority to issue preliminary injunctions in actions solely at law" and that the Grupo Mexicano Court "was not presented with, nor did it choose to address, a situation in which equitable remedies were claimed." Id. at 496.  The Fourth Circuit went on to explain that "where a plaintiff creditor has no lien or equitable interest in the assets of a defendant debtor, the creditor may not interfere with the debtor's use of his property before obtaining judgment," but "when the plaintiff creditor asserts a cognizable claim to specific assets of the defendant or seeks a remedy involving those assets, a court may in the interim invoke equity to preserve the *status quo* pending judgment where the legal remedy might prove inadequate and the preliminary relief furthers the court's ability to grant the final relief requested." Id.  The court also highlighted that the "nexus between the assets sought to be frozen through an interim order and the ultimate relief requested in the lawsuit is essential to the authority of a district court in equity to enter a preliminary injunction freezing assets." Id. at 496–97.  To analyze whether the district court had the authority to enter an order freezing the defendants' assets, the Fourth Circuit applied a two-step analysis "to determine [first] whether they seek cognizable relief in equity involving assets of the defendant" and, second, to determine "whether . . . the preliminary injunction freezing assets . . . is a reasonable measure to preserve the *status quo* in aid of the ultimate equitable relief claimed." Id. at 497.  After applying this framework, the Fourth Circuit ultimately concluded that "the district court was authorized by its traditional equitable power to issue a preliminary injunction in this action freezing the assets of the defendants" and "[t]hat money damages [we]re claimed along with equitable relief d[id] not defeat the district court's equitable powers." Id. at 498–99.

Courts in the First Circuit have consistently applied the Rahman two-part framework to require a showing that (1) the movant seek cognizable relief in equity with a sufficient nexus to the assets sought to be frozen, and (2) the preliminary injunction is a reasonable measure to

preserve the status quo in aid of the ultimate equitable relief claimed.  See, e.g., Novi Footwear Int'l Co. Ltd v. Earth Opco LLC, No. 22-cv-10952-RGS, 2022 WL 2873016, at *2–3 (D. Mass. July 21, 2022); Tamposi v. Denby, 988 F. Supp. 2d 152, 154–59 (D. Mass. 2013); Westernbank P.R. v. Kachkar, No. 07-cv-1606 (ADC), 2009 WL 2871160, at *7–8 (D.P.R. Sept. 1, 2009); Fairview Mach. & Tool Co. v. Oakbrook Int'l, Inc. ("Fairview"), 77 F. Supp. 2d 199, 201–06 (D. Mass. 1999).  Courts in several circuits have done so as well.  See, e.g., Pillow Menu, LLC v. Super Effective, LLC, No. 20-cv-03638-STV, 2021 WL 3726205, at *16–20 (D. Colo. Aug. 19, 2021); AAAG-Cal., LLC v. Kisana, 439 F. Supp. 3d 1265, 1278–79 (D. Utah 2020); Matrix Partners VIII, LLP, 2009 WL 175132, at *4–5; Newby, 188 F. Supp. 2d at 694–707; Wishnatzki & Nathel, Inc. v. H.P. Island-Wide, Inc., No. 00 CIV. 8051 (JSM), 2000 WL 1610790, at *1–2 (S.D.N.Y. Oct. 27, 2000); F.T. Int'l., Ltd. v. Mason, No. CIV.A. 00-5004, 2000 WL 1514881, at *1–2 (E.D. Pa. Oct. 11, 2000).

Applying this rubric to the case at bar, the Court concludes that it does not have the authority to issue the requested preliminary injunction because Faville stumbles at the first step. While Faville includes equitable claims in her complaint, she has not alleged any nexus between the proceeds of the sale of Munro's New Jersey home and the ultimate relief requested in her lawsuit.  Indeed, Faville simply characterizes the proceeds as "a critical source of recovery to which [she] may look to enforce a judgment," but offers not even an attenuated connection between the proceeds and the money she lent to Munro and hopes to recoup.  D. 1-3 ¶ 174; see D. 5 at 2; D. 6 at 2.  In fact, the record contradicts any assertion that such a connection exists.  D. 12-1 ¶ 5 (attesting that "[p]roceeds of the loans were not used to purchase the NJ House, to finance it or otherwise maintain it").

9

Relying upon Fairview, Faville suggested at oral argument that the nexus requirement is satisfied here because she included a claim for unjust enrichment in her complaint. In her view, such a claim creates an equitable interest in Munro's assets and finances generally, so as to satisfy the nexus requirement. The Court does not read Fairview to so hold. There, another session of this Court was confronted with a motion to reconsider a preliminary injunction order, which would require the defendant to place $630,000.00 in an escrow account. Fairview, 77 F. Supp. 2d at 200–01. The allegations at issue involved the defendants' alleged refusal to pay an outstanding balance of $630,000.00 for machinery the plaintiff sold to them, and the plaintiff raised several claims, including one for *quantum meruit*. Id. at 201. In applying the Rahman two-part framework and analyzing the nexus between the assets to be frozen and the plaintiff's claim, the court explained:

> Here, plaintiff Fairview alleges that it provided machinery and services for defendant Nuway's benefit for which plaintiff did not receive full payment. Nuway inspected and accepted the machinery and has now allegedly sold the machinery and other goods to a third party. The plaintiff seeks to recover, from specific assets of the defendant, the full agreed price of the machinery it provided. The plaintiff has an *equitable* interest in defendant's assets, since it seeks restitution for unjust enrichment. Thus, the plaintiff's claim for *quantum meruit* seeks cognizable relief in equity involving the specific assets of the defendant: *i.e.*, funds in the possession of the defendant to pay for the machinery it previously accepted.

Id. at 205. The Fairview court here does not suggest that the inclusion of a claim for *quantum meruit* or unjust enrichment categorically creates the "nexus . . . essential to the authority of a district court in equity to enter a preliminary injunction freezing assets." Rahman, 198 F.3d at 496–97. Rather, the nexus existed because the defendant had "allegedly sold the machinery and other goods to a third party" and the plaintiff wanted to freeze the exact amount of the outstanding balance which was allegedly in the defendant's possession. Fairview, 77 F. Supp. 2d at 205.

No such similar circumstances are present here. First, Munro's affidavit avers that none of the money Faville lent was used towards the New Jersey home, D. 12-1 ¶ 5, a factual allegation

that Faville does not dispute.  To be sure, nothing in the record suggests that Munro and Susan bought the New Jersey home after Faville made the loans in 2018.  Second, the defendant in Fairview was alleged to have received and sold the machinery, leaving him in possession of funds with a specific nexus to the machinery and unjustly enriched.  Here, it is not clear from the record that Munro ever used the loans to his personal benefit or is presently in possession of the money.  While Faville alleges that she wired the Munro Loan Principal to an account in the name of 1112 Third Ave and the SCWorx Loan Principal to Munro's personal account, Faville asserts in her complaint that she does not know what Munro did with either principal.  D. 1-3 ¶¶ 31, 35, 48–49.  Third, the plaintiff in Fairview sought to require the defendant to place the specific amount of the outstanding balance in escrow.  Fairview, 77 F. Supp. 2d at 201, 205.  Here, as Faville conceded at oral argument, factual disputes remain even as to the amount actually owed on the Loans.  Fairview, therefore, does not save Faville's cause.

As noted above, courts have consistently required the movant to demonstrate a nexus between the relief requested and the assets to be frozen, and where such a showing has not been made, courts have denied injunctive relief.  See, e.g., Pillow Menu, LLC, 2021 WL 3726205, at *20; Tamposi, 988 F. Supp. 2d at 159; In re Qwest Commc'ns Int'l, Inc., Sec. Litig., 243 F. Supp. 2d 1179, 1185 (D. Colo. 2003) (concluding that the "court does not have the authority to issue an injunction freezing the . . . assets because the plaintiffs have not asserted an equitable claim with a sufficient nexus to those assets" where "[n]othing in the record indicate[d] that . . . plaintiffs . . . ha[d] a particular or specific equitable claim traceable to the . . . assets").  In the absence of nexus between the proceeds of the sale of the New Jersey home and the ultimate relief requested in her lawsuit, this Court has no authority to issue the preliminary injunction.

**B.**    <u>**Merits of the Preliminary Injunction Motion**</u>

Even assuming, *arguendo*, that this Court has such authority, injunctive relief still is not warranted here.  The burden of satisfying the four elements for injunctive relief lies with the movant, <u>Lovell v. Brennan</u>, 728 F.2d 560, 563 (1st Cir. 1984) (citing <u>United States v. W.T. Grant Co.</u>, 345 U.S. 629, 633 (1953)), and where the movant has not shouldered their burden as to any of the four elements, such relief must be denied, <u>see</u> <u>Sindicato Puertorriqueño de Trabajadores v. Fortuño</u>, 699 F.3d 1, 10 (1st Cir. 2012) (citation omitted).

Here, even assuming a reasonable likelihood of success on any of her claims, Faville is not entitled to injunctive relief because she has not sufficiently demonstrated that she is likely to suffer irreparable harm if the Court withholds preliminary injunctive relief.  Generally, "harm which can be adequately compensated with money damages is not considered to be irreparable." <u>Fleet Nat'l Bank v. Rapid Processing Co.</u>, 643 F. Supp. 1065, 1066 (D. Mass. 1986) (citing cases). Nevertheless, "the story is quite different where there is a strong indication that the defendant may dissipate or conceal assts." <u>Micro Signal Rsch, Inc. v. Otus</u>, 417 F.3d 28, 31 (1st Cir. 2005) (citing cases).  In other words, irreparable harm can exist given a "[party's] probable fraud" and "his prevarications about repayment." <u>Id.</u>

Faville suggests she will suffer irreparable harm because the sale proceeds from the New Jersey home are a critical source of recovery and Munro has limited other assets to satisfy any judgment entered against him. D. 6 at 18–19.  She further suggests that there is a substantial risk that these funds will be dissipated or concealed given text messages from Susan stating that she and Munro have plans to "out run" Faville. <u>Id.</u> at 19; D. 1-4 at 78.  Even crediting those statements, Munro attests in his affidavit that he and Whacky Ventures, the alleged assignee of both notes, have more than sufficient assets to satisfy any judgment entered and that he has no plans to

dissipate or conceal his assets.  D. 12-1 ¶¶ 2, 4, 7–10.  Furthermore, Munro contests many of the facts associated with both the Munro Loan and SCWorx Loan.  Id. ¶¶ 5–9.

In cases such as these, "where there is significant dispute as to the underlying facts, the propriety of injunctive relief hinges on determinations of credibility."  del Rosario v. Nashoba Reg'l Sch. Dist., 419 F. Supp. 3d 210, 212 (D. Mass. 2019) (citation and internal quotation marks omitted).  As to Faville, her allegations as to irreparable harm—boiled down to their essence—are that Munro does not have any other assets to satisfy a judgment.  Not only does she fail to provide any support for this allegation besides her own statements, but her submissions to this Court also seem to undermine it.  For example, in her complaint, she repeatedly describes Munro as "a successful serial entrepreneur" and states that he "owns several residences."  D. 1-3 at ¶ 2.  In her brief, Faville states that Susan might be entitled to a portion of the proceeds from the sale of the New Jersey home, but Munro "can pay, or agree to pay, Susan separately" if the Court were to issue the preliminary injunction—thereby, further implying that Munro has other assets available to him. D. 6 at 19 n.12.  As to Munro, he states that there is no risk that he will dissipate or conceal his assets, but Faville has introduced several text messages between them showing prevarications about repayment on his part.  See, e.g., D. 1-4 at 43 (text from Munro to Faville: "Kelly i [sic] will get to it for sure"); id. at 48 (text from Faville to Munro: "You are one tough guy to reach"); id. at 51 (text from Faville to Munro: "It's just that you never respond"); id. at 52 (text from Faville to Munro: "Are you actually going to make me beg for my dead husbands [sic] life insurance money? Check never arrived.  You won't respond to my questions regarding tech mark [sic] money.  That is essentially my life's savings.  Please respond").  Ultimately, however, both parties appear to agree that Munro owns several residences, which could be an additional source of recovery.  D. 1-3 ¶ 2; D. 12 at 2.  Faville suggested at oral argument that Munro is planning to transfer these

properties to Susan to evade a judgment from this Court.  Once again, however, these allegations are only supported by her own statements, and contradicted by Munro's affidavit, in which he states that he has "no plans to dissipate or hide [his] personal assets."  D. 12-1 ¶ 2.  More importantly, the burden here lies with Faville, Lovell, 728 F.2d at 563 (citation omitted), and she has failed to sufficiently support her own allegations of irreparable harm or disprove Munro's further factual allegations.

As such, Faville has not demonstrated a risk of irreparable harm, which requires denial of preliminary injunctive relief.  See 4 MVR, LLC v. Warren W. Hill Constr. Co., Inc., No. 12-cv-10674-DJC, 2012 WL 3016223, at *4–5 (D. Mass. July 23, 2012) (denying preliminary injunctive relief seeking to freeze defendant's assets where plaintiff failed to demonstrate irreparable harm).

Additionally, Faville has not carried her burden as to the balance of hardships or public interest.  As to the balance of hardships, Faville states in her complaint that she has continued to receive the $30,000.00 quarterly interest payments required by the Munro Loan at least as recently as October 4, 2022.  D. 1-3 ¶ 79; see D. 12-1 ¶ 8.  In contrast, Munro would have a large sum of money frozen throughout the course of this litigation.  As to the public interest, while "the public has an interest in requiring parties to honor their contractual obligations," Dunkin' Donuts Franchised Rests. LLC v. ADM Donuts, Inc., No. CA 11-270 S, 2011 WL 6026129, at *8 (D.R.I Oct. 4, 2011) (citing cases), the public also has an interest in "enforcement of . . . contract[s] as written," Café Indigo, LLC v. Pearl River Pastry, LLC, No. 20-cv-419-JL, 2020 WL 5026745, at *9 (D.N.H. Aug. 25, 2020).  Here, it is undisputed that, according to each note, the borrower was not Munro.  D. 1-4 at 7, 13.  While Munro could eventually be found to be liable for some or all of Faville's claims, the public interest concerns do not at this juncture conclusively tilt in her favor, especially in light of the lack of a demonstrable risk of irreparable harm.  See id. (explaining that

"the public interest here [is] more or less equally balanced.  [The plaintiff] is right to invoke the contract enforcement.  And [the defendant] is not wrong that these interests favor enforcement of the contract as written.  Thus, [the public interest concerns do not] tip the balance far enough in favor of an injunction to overcome the lack of a demonstrable risk of irreparable harm").

Accordingly, injunctive relief is not warranted because Faville has failed to carry her burden in establishing the required elements for such relief.

## VI.     Conclusion

For at least the foregoing reasons, the Court DENIES the motion for a preliminary injunction, D. 5.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge